# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 978 and 02 C 3436 | **DATE** | January 17, 2003 |
| **CASE TITLE** | | *Birnberg v. Milk Street Residential, et al.* | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, DENIES the Motion to Dismiss Under Rule 12(b)(2) For Lack of Personal Jurisdiction [37-1, 36-1, and 9-1] as to BFGI, Clar Enterprises and Clark Onterie and GRANTS the motion with respect to BFTGI; and GRANTS the Motion to Dismiss Under Rule 12(b)(6) For Failure to State a Claim [37-1, 36-1, 9-1, 7-1] as to Counts III and IV with respect to Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, Clark Enterprises, and Clark Onterie and Count VII with respect to all moving Defendants, and DENIES the motion as to Counts I, II, V, and VI with respect to all Defendants and Count IV with respect to LMA.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | JAN 21 2003 | | 90 |
| | Docketing to mail notices. | date docketed | | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | docketing deputy initials | | |
| RTS | courtroom deputy's initials | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED

JAN 2 1 2003

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CARL BIRNBERG and JACOB MOSKOVIC,
on behalf of themselves and all others similarly
situated,

      Plaintiffs,

      v.

MILK STREET RESIDENTIAL ASSOCIATES
LIMITED PARTNERSHIP, LEND LEASE REAL
ESTATE INVESTMENTS, INC., BOSTON
FINANCIAL TECHNOLOGY GROUP INC.,
LAKE MICHIGAN ASSOCIATES, LLC, LMA        Hon. Blanche M. Manning
GP LLC, CLARK ENTERPRISES, INC. AND
CLARK ONTERIE, L.L.C.,        02 C 0978, 02 C 3436

      Defendants.        (Consolidated Proceedings)

CARL BIRNBERG and JACOB MOSKOVIC,
on behalf of themselves and all others similarly
situated,

      Plaintiffs,

      v.

BOSTON FINANCIAL GROUP, LIMITED
PARTNERSHIP, AND BOSTON FINANCIAL
GROUP, INC.

      Defendants.

### MEMORANDUM AND ORDER

Plaintiffs Carl Birnberg and Jacob Moskovic brought the instant diversity actions, on

behalf of themselves and a proposed class, for breach of fiduciary duty, breach of contract,

breach of implied covenant of good faith and fair dealing, violation of the Illinois Consumer

Fraud and Deceptive Business Practices Act, intentional interference with contractual relations,



fraud, and negligent misrepresentation against: (1) Milk Street Residential Associates Limited Partnership ("Milk Street"), a Massachusetts limited partnership; (2) Lend Lease Real Estate Investments, Inc. ("Lend Lease"), a Delaware corporation; (3) Boston Financial Technology Group, Inc. ("BFTGI"), a Massachusetts corporation; (4) Lake Michigan Associates LLC ("Lake Michigan"), a Delaware limited liability company; (5) LMA GP LLC ("LMA"), a Delaware limited liability company, (6) Clark Enterprises, Inc. ("Clark Enterprises"), a Maryland corporation; (7) Clark Onterie, LLC ("Clark Onterie"), a Maryland corporation; (8) Boston Financial Group, Limited Partnership ("BFGLP"), a Massachusetts limited partnership; and (9) Boston Financial Group, Inc. ("BFGI"), a Massachusetts corporation.

The instant matter comes before the Court on Defendants BFGI, BFTGI, Clark Enterprises, and Clark Onterie's Motions to Dismiss Under Rule 12(b)(2) For Lack of Jurisdiction [36-1 and 9-1] and Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, LMA, Clark Enterprises, and Clark Onterie's Motions to Dismiss Under Rule 12(b)(6) For Failure to State a Claim [37-1, 36-1, 9-1, and 7-1].[1]

For the reasons that follow, the Rule 12(b)(2) motion is GRANTED as to BFTGI and DENIED with regard to BFGI, Clark Enterprises, and Clark Onterie, while the Rule 12(b)(6) motion is GRANTED in part and DENIED in part.

---

[1]     Milk Street has not filed or joined in any of the motions to dismiss.

2

## BACKGROUND[2]

This matter stems from a partnership dispute arising out of the Franklin Building Associates Limited Partnership ("the Franklin Partnership"). Plaintiffs, two of the limited partners, who reside in Illinois and Minnesota, brought this action against the general partners and several companies allegedly affiliated with the general partners.

The Franklin Partnership was formed by BFTGI in 1984 to own units in Onterie Associates, an Illinois limited partnership, which was created to own and operate the Onterie Center, a 60 story residential and commercial building in Chicago, Illinois. Plaintiffs were among 174 limited partners who bought an interest in the Franklin Partnership. Defendant Milk Street was the general partner of the Franklin Partnership from 1984 until December of 1999.

Unfortunately, the Onterie Center, and thus the Franklin Partnership, was not a financial success, and as a result, the Onterie Center defaulted on one of its loans and the limited partners did not receive any return on their investments.

As a result of the poor financial condition of the Onterie Center, Plaintiffs allege that Defendants created a scheme to unlawfully enrich themselves at the expense of the limited partners. On February 23, 1999, Defendants mailed the limited partners a memorandum outlining a plan to acquire the limited partners' interests and substitute LMA for Milk Street as the general partner. Plaintiffs alleged that this memorandum was "false and misleading" in that it: (1) misrepresented Onterie's value in order to induce the Limited Partners to grant their consents; (2) failed to disclose pervasive conflicts of interest which were part of the buy-out

---

[2]      The facts in the Background section are taken from Plaintiffs' Complaints.

scheme; and (3) left out pertinent and fundamental information which Defendants were required to disclose.

As a result of the February 23rd memorandum and other actions by Defendants, Plaintiffs allege that Defendants were able to purchase the limited partners' interests in the Franklin Partnership. Plaintiffs allege that Defendants breached their fiduciary duty to the limited partners, breached the Franklin Partnership agreement, breached the implied covenant of good faith and fair dealing, violated the Illinois Consumer Fraud and Deceptive Business Practices Act, intentionally interfered with the limited partners' contractual relations, defrauded the limited partners, and made several negligent misrepresentations in offering to buy the limited partners' interests.

After taking limited discovery on jurisdictional issues, Defendants moved to dismiss for lack of personal jurisdiction, pursuant to Rule 12(b)(2), and for failure to state a claim, under Rule 12(b)(6). The Court will discuss each of these motions in turn.

## ANALYSIS

**I.      Motion to Dismiss for Lack of Personal Jurisdiction**

In ruling on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the court may consider matters outside the pleadings, such as affidavits and other materials submitted by the parties. O'Hare Int'l Bank v. Hampton, 437 F.2d 1173, 1176 (7th Cir. 1971). The plaintiffs bear the burden of establishing personal jurisdiction by a preponderance of the evidence. Turnock v. Cope, 816 F.2d 332, 333 (7th Cir. 1987). The court must resolve any factual disputes in the plaintiffs' favor, and accept the allegations in the plaintiffs' complaints as true only to the

extent that they are not controverted by other evidence in the record.  Id.  The court must also

accept uncontested jurisdictional facts presented by the defendants as true.  Connolly v.

Samuelson, 613 F. Supp. 109, 111 (N.D. Ill. 1985).

A federal court sitting in diversity has personal jurisdiction over nonresident defendants

only if jurisdiction would be proper in the state in which the federal court sits.  Michael J.

Neuman & Assocs., Ltd. v. Florabelle Flowers, Inc., 15 F.3d 721, 724 (7th Cir. 1994).  The

Illinois long-arm statute contains a "catch-all" provision that allows Illinois courts to assert

personal jurisdiction to the maximum extent permitted by the Illinois and United States

Constitutions.  735 ILCS 5/2-209(c).[3]  Thus, jurisdiction is coextensive with federal due process

requirements.  See RAR, Inc. v. Turner Diesel Ltd., 107 F.3d 1272, 1276 (7th Cir. 1997).

Therefore, to determine whether personal jurisdiction is proper, the court must examine whether

personal jurisdiction comports with Illinois and federal due process guarantees.  Id.

Unfortunately, Illinois courts  "have given little guidance as to how state due process

protection differs from federal protection in the context of personal jurisdiction."  Id.  As a

general rule, "'jurisdiction [under the Illinois constitution] is to be asserted only when it is fair,

just, and reasonable . . . considering the quality and nature of the defendant's acts which occur in

Illinois or which affect interests located in Illinois.'"  Id. (quoting Rollins v. Ellwood, 565 N.E.2d

1302, 1316 (Ill. 1990)).  Without specific guidance from Illinois courts, federal courts sitting in

diversity in Illinois focus on federal due process in determining if Illinois due process guarantees

---

[3]     The Illinois long-arm statute also gives Illinois courts jurisdiction over nonresident
defendants "doing business" in Illinois, if the claims arise from their "transactions" in Illinois, if
the defendants committed a "tortious act" within Illinois, or if they own real property in Illinois.
735 ILCS 5/2-209(a) & (b).

are satisfied. See Mors v. Williams, 791 F. Supp. 739, 743 (N.D. Ill. 1992). Consequently, absent a clear indication that exercise of jurisdiction here violates the Illinois Constitution, this Court will rely on its federal analysis of jurisdiction to determine if personal jurisdiction comports with Illinois due process.

To assert personal jurisdiction consistent with federal due process, the defendants must have: (A) "certain minimum contacts with the forum state" such that (B) the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

The court's assessment of minimum contacts depends on whether "general" or "specific" jurisdiction is at issue. RAR, 107 F.3d at 1277. Specific jurisdiction refers to jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum." Id. The court may exercise specific jurisdiction over defendants if they "purposefully established minimum contacts within the forum state" and those contacts "make personal jurisdiction fair and reasonable under the circumstances." Id. In examining a defendant's contacts with a particular state, the court must determine whether the defendant "purposefully availed itself of the privilege of conducting activities" in the forum state so that it "should reasonably anticipate being haled into court there." Id. In other words, the focus of the court's inquiry must be on the "relationship among the defendant, the forum, and the litigation." Heritage House Rests., Inc. v. Cont'l Funding Group, Inc., 906 F.2d 276, 283 (7th Cir. 1990). The main factor in specific jurisdiction analysis is foreseeability – was it reasonably foreseeable to the defendant that its action could result in litigation in the state in question. Burger King Corp. v. Rudzewicz, 471

6

U.S. 462, 472-74 (1985). Contacts that are "random, fortuitous, or attenuated" are not sufficient to establish that a state's exercise of personal jurisdiction over the defendant was foreseeable. Heritage House, 906 F.2d at 283. Moreover, in examining the contacts in a specific jurisdiction analysis, the court cannot "simply aggregate all of the defendant's contacts with the state – no matter how similar in terms of geography, time, or substance." RAR, 107 F.3d at 1277.

In contrast to specific jurisdiction, general jurisdiction is applicable when the lawsuit neither arose nor was related to the defendant's contacts with forum state. Id. Such jurisdiction is permitted only where the defendant has "continuous and systematic general business contacts" with the state. Id. The general jurisdiction standard is "a fairly high standard requiring a great amount of contacts." Jamik, Inc. v. Days Inn of Mount Laurel, 74 F. Supp. 2d 818, 822 (N.D. Ill. 1999). Factors courts examine in determining whether general jurisdiction exist include: (1) whether and to what extent the defendant conducts business in the forum state; (2) whether the defendant maintains an office or employees within the forum state; (3) whether the defendant sends agents into the forum state to conduct business; (4) whether the defendant advertises or solicits business in the forum state; and (5) whether the defendant has designated an agent for service of process in the forum state. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984).

If the court finds that it has either specific or general jurisdiction, the court must still ensure that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." Int'l Shoe Co., 326 U.S. at 316. Under this determination, the court examines: (1) the interest of the state in providing a forum to the plaintiff; (2) the interest of the

state in regulating the activity involved; (3) the burden of defense in the forum on the defendant; (4) the relative burden of prosecution elsewhere on the plaintiff; (5) the extent to which the claim is related to the defendant's local activities; and (6) the avoidance of a multiplicity of suits on conflicting adjudications. See Asahi Metal Inds. Co. v. Super. Ct. of Cal., 480 U.S. 102, 115 (1987); Burger King, 471 U.S. at 472-73, 476-77. Because no one factor is dispositive, this Court must balance all of the factors. Euromarket Designs, Inc. v. Crate & Barrel Ltd., 96 F. Supp. 2d 824, 840 (N.D. Ill. 2000). However, the most important factors to consider are the interests of the forum and the relative convenience of the defendant in litigating in that forum. Kohler Co. v. Kohler Int'l, Ltd., 196 F. Supp. 2d 690, 700 (N.D. Ill. 2002). It is well-settled, however, that a party that has directed its activities at the forum state bears the burden of presenting a "compelling case" that these other considerations make jurisdiction in the forum unreasonable. Burger King, 471 U.S. at 477.

Here, BFTGI, BFGI, Clark Enterprises, and Clark Onterie contend that Plaintiffs "cannot demonstrate that personal jurisdiction is satisfied under either the general jurisdiction or specific jurisdiction standard." The Court will thus examine whether it has jurisdiction over each of these Defendants.

### A.     Boston Financial Technology Group, Inc.

BFTGI has presented evidence showing that on March 31, 1986, it changed its name to BFGI and ceased to exist as a business entity. See Gladstone Decl. at 2 (Def. BFGI's Mot. to Dismiss, Ex. A); Articles of Amendment (Id., Ex. B) (certificate stating name change). Because Plaintiffs have not contested this assertion, the Court accepts this fact as true for the purposes of

8

this motion. Connolly, 613 F. Supp. at 111. Therefore, because the relevant time period regarding the dispute over the Franklin Partnership stems from January 1, 1997 to December 21, 2001, see Bimberg v. Milk Street, 2002 WL 1162848, at *6 (N.D. Ill. May 24, 2002), this Court finds that BFTGI did not have minimum contacts with Illinois during the relevant time period, and therefore, the Court GRANTS BFTGI's Motion to Dismiss Under Rule 12(b)(2) for Lack of Jurisdiction.

### B. Boston Financial Group, Inc.

Plaintiffs contend that a number of mailings by BFGI to the limited partners, many of whom lived in Illinois, are sufficient contacts to enable this Court to assert jurisdiction over BFGI. Before discussing these mailings, however, the Court will examine whether documents mailed to residents of Illinois satisfy the minimum contacts requirement.

Generally, mail from a foreign defendant to individuals within the forum state is insufficient by itself to provide a basis for the exercise of personal jurisdiction. Greenberg v. Miami Children's Hosp. Research Inst., Inc., 208 F. Supp. 2d 918, 926 (N.D. Ill. 2002). Where, however, the communication constitutes a "tortious act," it is sufficient to establish minimum contacts. See Heritage House Restaurants, Inc. v. Continental Funding Group, Inc., 906 F.2d 276, 282 (7th Cir. 1990). The Illinois long-arm statute provides in relevant part that:

> Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person . . . to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any such acts: (2) The commission of a tortious act within this State.

9

735 ILCS 5/2-209(a)(2). Under section 2-209(a)(2), "a single tortious act occurring in Illinois will establish jurisdiction in Illinois, even though the defendant has no other contact in Illinois and has never been to Illinois." Mergenthaler Linotype Co. v. Leonard Storch Enter. Inc., 383 N.E.2d 1379, 1384 (Ill. App. Ct. 1978). Courts have broadly construed the term "tortious act" to include acts beyond those which "create common law liability" to include "any act that constitutes a breach of duty to another imposed by law." Vlasak v. Rapid Collection Sys., Inc., 962 F. Supp. 1096, 1100 (N.D. Ill. 1997). See also Ohio-Sealy Mattress Mfg. Co. v. Kaplan, 429 F. Supp. 139, 140 (N.D. Ill. 1977) ("[t]he word 'tortious' . . . is not restricted to the technical definition of a tort, but also includes any act committed within the state which involves a breach of duty to another and makes the actor liable for damages").

Applying the above principles, courts have held that mailings by non-resident defendants which constitute a tort and are sent to Illinois residents and affect interests in Illinois are sufficient to confer jurisdiction over the non-resident defendant under section 2-209. See Cross v. Simons, 729 F. Supp. 588, 592 (N.D. Ill. 1989); McClub Serv., Inc. v. Stovall, 714 F. Supp. 370, 373 (N.D. Ill. 1989). In McClub, 714 F. Supp. at 371, in a diversity action against a Texas defendant for breach of contract, fraud, and fraudulent inducement, the defendants moved to dismiss for lack of personal jurisdiction based on the grounds that its only contact with Illinois was a few telephone calls and mailings to the plaintiff, an Illinois resident. Applying Illinois law, the court held that "the mailing of . . . messages into Illinois that constitutes part of the tortious conduct, coupled with an intent to affect Illinois interests, satisfies the requirements of [section 2-209(a)(2)]." Id. Denying the motion, the court found that the plaintiff met requirements of

10

section 2-209(a)(2) by alleging that the tortious conduct consisted of mailing the fraudulent statements into Illinois, which were intended to and did result in economic injury to Illinois residents. Id.

With these factors in mind, the Court now examines the mailings which Plaintiffs contend establish personal jurisdiction in Illinois under section 2-209. On February 23, 1999, the limited partners received a memorandum in the mail ("the February Memorandum") which proposed a buy-out of the Franklin Partnership whereby LMA would replace Milk Street as the Franklin Partnership's general partner, acquire the limited partners' interests, and ultimately acquire the Onterie Center. The memorandum sought the limited partners' written consent for the proposed acquisition. Enclosed with the memorandum were a consent, proxy, special power of attorney, a certificate of non-foreign status, and a release for LMA and Milk Street (which would be signed only if the above transactions were completed).

The February Memorandum listed BFGI as an attorney for the Franklin Partnership and included a power of attorney which stated that the signee

> irrevocably constitutes and appoints each of the Attorneys, in each case with full power of substitution, the true and lawful attorney-in-fact of the Principal, in his name, place, and stead, to make, execute, consent to, swear to, acknowledge, publish, record and file: All such instruments as the Attorneys or any of them may deem necessary or desirable to carry out the provisions of the sale, as discussed in the Memorandum, in accordance with its terms.

In support of its contention that BFGI was one of the entities which mailed the February Memorandum, Plaintiffs point to the Cooperation Agreement of May 25, 1999, which was signed by Milk Street, BFGI, BFTGI, and LMA. (Pls.' Mem. in Opp'n, Ex. F.) The Cooperation Agreement states that "BFGI, as successor to [BFTGI], has certain rights pursuant to the Second

11

Amended and Restated Agreement and Certificate of Limited Partnership of Onterie." Paragraph five states that:

> BFGI hereby represents that it sent the [February] Memorandum to all Investor Limited Partners in Franklin of record as of the dates of the three documents constituting the [February] Memorandum and received the document entitled Consent, Power of Attorney and Proxy from Investor Limited Partners in Franklin holding more than sixty-eight percent of the Investor Limited Partner interests in Franklin.

Based on this document, it would appear that BFGI sent out the allegedly deceptive and fraudulent February Memorandum and that it received the documents enclosed therein from the limited partners.[4]

To rebut the contention that BFGI mailed the February Memorandum to the limited partners, BFGI relies on the deposition testimony of Michael Gladstone, former vice-president of BFGI and a limited partner of BFGLP. (See Defs' Reply, Ex. D.) According to Gladstone, by 1992, BFGI "pretty much ceased to operate as an operating company" because "virtually" all of its assets, rights, and responsibilities were transferred to BFGLP for tax purposes. (Id. at 15, 20-21.) After 1992, BFGLP "became our operating entity" and BFGI's "primary purpose was to serve as general partner of a couple of real estate limited partnerships." (Id. at 16-17.) Because BFGI "was not an operating entity at the time," Gladstone testified that it was not involved in the buy-out of the limited partners in 1998. (Id. at 57.) Gladstone stated that the reference to BFGI in the Cooperation Agreement was "careless on our part in preparing the document . . . . When

---

[4]     Additionally, Plaintiffs cite to a number of other correspondences which were sent to the limited partners which purport to be updates on the purposed purchase of the limited partners' interests in the Franklin Partnership. (See Pls' Mem. in Opp'n, Exs. C, D, E and F.) Each of these correspondences state that they are from "Boston Financial."

this document was being drafted, we were probably not all that focused on what entity was referred to in Paragraph 5. We were merely trying to make the representation that the investor memos had been sent to all limited partners, and we were not focused on the abbreviation BFGI." (Id. at 88.) Gladstone further asserted that the reference to "Boston Financial" in the various other correspondences mailed to the Limited Partners actually referred to BFGLP not BFGI. (Id. at 60, 63, 65.) Consequently, relying on Gladstone's deposition testimony, BFGI contends that "though this Court may have jurisdiction over [BFGLP] due process simply does not permit jurisdiction over [BFGI]."

Despite Mr. Gladstone's testimony, this Court finds that whether BFGI sent the February Memorandum is a factual dispute which this Court must resolve in Plaintiffs' favor. Turnock, 816 F.2d at 333. This finding is supported not only by the plain language of the February Memorandum and the Cooperation Agreement, but by the fact that Mr. Gladstone signed the Cooperation Agreement on behalf of BFGI. Mr. Gladstone testified that BFGI "pretty much" ceased to operate after 1992. If, however, BFGI, was not an operating entity after 1992, then it is unclear why Mr. Gladstone would have signed the Cooperation Agreement on its behalf on May 25, 1999. Therefore, for purposes of determining only whether this Court can assert jurisdiction over BFGI at this time, this Court finds that the February Memorandum was mailed by BFGI.

Even though Plaintiffs have established that BFGI mailed the February Memorandum to Illinois, to establish jurisdiction under section 2-209(a)(2), Plaintiff must still show that the mailing of the February Memorandum constituted a tort which was intended to and did cause injury to an Illinois resident. Plaintiffs allege that Defendants devised a plan to fraudulently buy-

13

out the limited partners. As part of this plan, BFGI allegedly sent the February Memorandum which was "false and misleading" in that it: (1) "misrepresented Onterie's value in order to induce the Limited Partners to grant their consents"; (2) failed to disclose "pervasive conflicts of interest" which were part of the buy-out scheme; and (3) left out pertinent and fundamental information which Defendants were required to disclose. As a result of the misrepresentations in the February Memorandum, Plaintiff allege that Defendants improperly acquired the limited partners' interests "for far less than their true value" and caused the limited partners to unnecessarily incur "huge tax liabilities."

Consequently, for the purposes of this motion, the Court finds that the Complaint sufficiently alleges that the February Memorandum was mailed as to Illinois residents, constituted a "tortious act," and caused injuries to Illinois residents. The Court thus holds that it has jurisdiction over BFGI under 735 ILCS 5/2-209(a)(2).

Although this Court has jurisdiction over BFGI under the Illinois long-arm statute, federal due process also requires that the exercise of personal jurisdiction over a nonresident defendant be reasonable. Int'l Shoe, 326 U.S. at 316. Illinois has a strong interest in adjudicating injuries that occur within its borders. Coolsavings.com, Inc. v. IQ.Commerce Corp., 53 F. Supp. 2d 1000, 1005 (N.D. Ill. 1999). This interest is especially strong in cases involving torts within Illinois' borders. M/H Group v. Macsoft, Inc., No. 86 C 8163, 1987 WL 7823, at *3 (N.D. Ill. March 9, 1987) (states have a special interest in exercising jurisdiction over those who commit torts within its jurisdiction). An individual injured in Illinois need not go to another state to seek

redress from persons who, though remaining in that other state, knowingly committed a tort causing an injury in Illinois. See Calder v. Jones, 465 U.S. 783, 790 (1984).

Moreover, it would not be unduly burdensome for BFGI to litigate in Illinois. Euromarket Designs, Inc. v. Crate & Barrel, Ltd., 96 F. Supp. 824, 840 (N.D. Ill. 2000)(unless the inconvenience of having to litigate in the forum is so great as to deprive the defendant of due process, it will not overcome clear justifications for the exercise of jurisdiction). Traveling from Massachusetts, where BFGI is incorporated and has its principal place of business, to Illinois is not oppressive. See id. (modern advances in transportation and communication make it more reasonable to litigate in a foreign forum). Therefore, this Court holds that it would not be unreasonable to exercise personal jurisdiction over BFGI.

Accordingly, because BFGI has minimum contacts with Illinois and it is not unreasonable to exercise jurisdiction over it, this Court holds that it has personal jurisdiction over BFGI.

## C.  Clark Enterprises and Clark Onterie

Plaintiffs also contend that the following contacts enable this Court to assert specific jurisdiction over Clark Enterprises and Clark Onterie: (1) travel to Illinois by their representatives; and (2) ownership of the Onterie Center.[5] The Court will discuss each of these contacts in turn.

---

[5]     Plaintiffs also contend that this Court has general jurisdiction over Clark Enterprises and Clark Onterie. Because this Court finds that it has specific jurisdiction, it will not discuss the general jurisdiction contention.

### 1. Travel to Illinois

To establish specific jurisdiction based on the defendant's travel to the forum state, the travel must have been significantly related to the dispute at issue. See Wis. Elec. Mfg. Co. v. Pennant Prods., Inc., 619 F.2d 676, 678 (7th Cir. 1980) (holding that two trips to Illinois which "were significant in the formation of the contract and [the defendant's] efforts to have it satisfactorily performed" were sufficient contacts to create specific jurisdiction). See also RAR, 107 F.3d at 1278 ("[u]nless their contacts are continuous and systematic enough to rise to the level of general jurisdiction, individuals and corporations must be able to conduct interstate business confident that transactions in one context will not come back to haunt them unexpectedly in another"); LaSalle Nat'l Bank v. Vitro, Sociedad Anonima, 85 F. Supp. 2d 857, 861 (N.D. Ill. 2000) ("[t]the claims in the complaint must relate to, or arise out of, the contacts with the forum").

Here, Plaintiffs assert that representatives of Clark Enterprises traveled to Illinois several times within the past few years. These trips include: (a) a trip by Lawrence Nussdorf to meet with potential attorneys for litigation involving Chandra Jha, one of the general partners in Onterie Associates; (b) a trip by Nussdorf and A.J. Clark to view the Onterie project and meet with the building engineer and Jha; (c) a trip by Nussdorf to meet with Northwestern Memorial Hospital in connection with its lease at the Onterie Center; (d) a trip by Rebecca Owen to meet with three Chicago-based law firms to interview legal counsel for the Jha litigation; and (e) a trip by Robert Flanagan to meet with individuals involved in business matters with an affiliate of Clark Enterprises.

Plaintiffs, however, have failed to explain how Clark Enterprises' contacts regarding the Jha litigation are related to the instant litigation. Similarly, Plaintiffs have not showed how Mr. Flanagan's meeting with Clark Enterprises' affiliate for "business matters" was connected with the instant suit. Plaintiffs have also failed to show that the trips that Clark Enterprise executives took to Chicago regarding the Onterie Center are related to this litigation – e.g., the misrepresentations made to the limited partners and the purchase of the limited partners' interests in the Franklin Partnership. The fact that Clark Enterprise executives took trips to Chicago regarding the general business of the Onterie Center is not sufficient minimum contact for this Court to assert specific jurisdiction over Clark Enterprises.

Plaintiffs also contend that representatives of Clark Onterie's manager, Clark Realty Capital, L.L.C. ("Clark Realty"), traveled to Chicago regarding Clark Onterie's investment in Lake Michigan. This contention is based on Clark Onterie's responses to interrogatories. In response to this admission, Margery Silberstein, assistant general counsel of Clark Enterprises and Defendants' Rule 30(b)(6) deponent on jurisdictional issues, testified that Clark Onterie's response to this interrogatory was "not 100% accurate" because Clark Realty took these trips on behalf of Lake Michigan not Clark Onterie. This statement, however, was contradicted by other testimony given by Ms. Silberstein. For example, she testified that one of Clark Realty's managers traveled to Chicago in connection with the Onterie Center to sign the closing statement on behalf of Clark Onterie. Additionally, several other managers of Clark Realty traveled to Chicago for which Clark Onterie was billed for the travel. Consequently, because there is conflicting evidence on this point, this Court must resolve any factual disputes in the plaintiffs'

17

favor. Turnock, 816 F.2d at 333. Therefore, for jurisdictional purposes, this Court will assume that these trips were made on behalf of Clark Onterie.[6]

### 2. Ownership of the Onterie Center

Plaintiffs further contend that this Court has jurisdiction because Clark Enterprises and Clark Onterie own real property in Illinois (the Onterie Center). Plaintiffs are correct that they can establish jurisdiction by showing that Clark Enterprises and Clark Onterie own real estate in Illinois. See 735 ILCS 5/2-209(a)(3) ("[a]ny person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts enumerated, thereby submits such person . . . to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts: . . . (3) The ownership, use, or possession of any real estate situated in this State").

There is, however, a problem with this contention. As Defendants correctly point out, Clark Enterprises and Clark Onterie do not directly own real estate in Illinois. Instead, they own the Onterie Center indirectly through their ownership in affiliated companies.

Generally, jurisdiction over a subsidiary is insufficient to confer jurisdiction over a nonresident parent. LaSalle Nat'l Bank, 85 F. Supp. 2d at 864. However, "[i]f the parent sufficiently controls the subsidiary, then courts will impute the acts of the subsidiary to the parent." Id. The general rule assumes that there will be some control in a normal parent-subsidiary relationship. Id. Illinois courts have recognized two methods for establishing jurisdiction over a foreign corporation based on the activities of its subsidiary. Gruca v. Alpha

---

[6] As explained below, the Court finds that the actions of Clark Realty can be attributed to Clark Onterie for jurisdictional purposes

Therapeutic Corp., 19 F. Supp. 2d 862, 866 (N.D. Ill. 1998). Under the first method, the plaintiff must provide evidence that justifies piercing the corporate veil of the parent company. Id. Under the second method, the plaintiff must show that the parent substantially controls the activities of a subsidiary doing business in Illinois. Id.

Under Illinois law, a corporation's veil may be pierced if there is: (1) such unity of interest and ownership that the separate personalities of the corporation and the subsidiary would no longer exist; and (2) adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. Id. To determine if there is a sufficient "unity of interest and ownership" between two corporations, Illinois courts look to four factors: (1) the failure to maintain adequate corporate records or to comply with corporate formalities; (2) the commingling of funds or assets; (3) undercapitalization; and (4) one corporation treating the assets of another as its own. Id.

Under the second approach, which is "more flexible," the court must determine "whether the parent has substantially controlled the subsidiary." LaSalle Nat'l Bank, 85 F. Supp. 2d at 864-65. Precisely how much control the parent must have is "hard to state with precision," in part because there will always "be some control in the normal parent/subsidiary relationship." Id. See aslo Gruca, 19 F. Supp. 2d at 8-68 ("[i]t is an economic fact of life that subsidiaries are subject to the overall direction of the parent, with a unity of interest and common objective").

The court in Gruca identified several factors to consider in determining if a parent is so closely linked to its subsidiary that jurisdiction over the subsidiary creates jurisdiction over the parent: (1) whether the parent arranges financing for and capitalization of the subsidiary; (2)

19

whether separate books, tax returns, and financial statements are kept; (3) whether officers or directors are the same; (4) whether the parent holds its subsidiary out as an agent; (5) the method of payment made to the parent by the subsidiary; (6) and how much control is exerted by the parent over the daily affairs of its subsidiary. Gruca, 19 F. Supp. 2d at 867.

Here, after examining the deposition testimony of Ms. Silberstein, Defendants' responses to interrogatories, and the organizational/ownership chart of the Onterie Center, LP, this Court makes the following findings of fact for the purposes of the instant motion to dismiss for lack of personal jurisdiction.

Dissecting the corporate structure of the entities and indivduals who actually own the Onterie Center is no easy task. Although Clark Enterprises indirectly owns the Onterie Center, its ownership interest is four tiers away from the Onterie Center. Clark Enterprises owns a 35% interest in Clark LMA, LLC, who in turn owns a 75% interest in LMA, LLC, who in turn has a 100% interest in LMAGP, LLC, who in turn is a 98.5% owner of Onterie Center, LP, which actually owns the Onterie Center. Likewise, Clark Onterie owns an interest in the Onterie Center through its ownership interest in LMA, LLC.

Simply looking at the wed of ownership, however, does not tell the whole story. A close examination of the corporate structure of the Clark entities – Clark Enterprises, Clark LMA, and Clark Onterie - reveals that they are joined at the hip. Many of Clark Enterprises' directors and officers are also managers of Clark Realty, which manages Clark Onterie, the LMA entities, and Clark LMA. The operating agreement of each of these entities specifically state that they cannot take any action on their own, only through Clark Realty. Moreover, the same executives and

directors of Clark Enterprises, who also manage Clark Realty, also own interests in Clark Onterie and Clark LMA. In fact, overall, including the interests of its executives and directors in Clark LMA, Clark Enterprises has over a 60% interest in Clark LMA.

Based on this incestuous corporate structure, it is not surprising that Ms. Silberstien testified that Clark LMA, the LMA entities, and Clark Onterie "exist solely for the purpose of owning an interest in the Onterie Center," and that they do not have any employees, directors, or officers. (Silberstien Dep. at 49.)

In response, Clark Enterprises and Clark Onterie contend that Plaintiffs have not proffered any evidence relating to many of the factors discussed above such as whether Clark LMA, LLC and the LMA entities keep their own books, tax returns and financial statements. The reason for this lack of evidence, however, is due to Ms. Silberstien's lack of knowledge on these issues. Ms. Silberstien was designated by Clark Enterprises as its Rule 30(b)(6) deponent for a deposition on jurisdictional discovery, and therefore, she should have had knowledge of these issues. Smithkline Beecham Corp. v. Apotex Corp., 2000 WL 116082, at *8-9 (N.D. Ill. Jan. 24, 2000). At her deposition, however, Ms. Silberstien lacked knowledge to answer questions on these issues. Therefore, this Court finds that these issues are questions of fact, which for the purposes of this motion are to be decided in Plaintiffs' favor. See Fed. R. Civ. Pro. 37(b)(2)(A).

Therefore, based on this evidence, this Court finds that Clark LMA, LLC and the LMA entities were simply shells created so that Clark Enterprises and Clark Onterie would have an ownership interest in the Onterie Center, which is located in Illinois.

21

This decision is supported by the holding in Wesleyan Pension Fund, Inc. v. First Albany Corp., 964 F. Supp. 1255 (S.D. Ind. 1997), which is factually similar to the present case. The plaintiff in Wesleyan, a pension fund, brought an action for fraud to recover losses it suffered after investing in several real estate limited partnerships with the non-resident defendants. Id. at 1257. The defendants, who consisted of three individuals, nine closely held corporations, and three limited partnerships, brought a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2). Id.

In denying the Rule 12(b)(2) motion, the court rejected the defendants' contention that the plaintiff must demonstrate that each defendant had minimum contacts with the forum. Id. at 1261. Instead, the court held that, for purposes of determining jurisdiction, it would treat the defendants as a "single entity." Id. The court noted that the presumption that a subsidiary is independent from its parent may be overcome by evidence that "the parent has greater control over the subsidiary, than normally associated with common ownership and directorship or where the subsidiary is merely an empty shell." Id. at 1262. See also APS Sports Collectibles, Inc. v. Sports Time, Inc., 299 F.3d 624, 631 (7th Cir. 2002) (applying Illinois law, the court held that a plaintiff may pierce the corporate veil by "showing that one corporation is really a dummy or sham for another"); YKK USA, Inc. v. Baron, 976 F. Supp. 743, 747 (N.D. Ill. 1997) (plaintiff may pierce the corporate veil by "by alleging that the corporation was a mere shell utilized by the individual defendant for his own personal benefit").

Applying the above principles, the court in Wesleyan held that "it would be entirely reasonable to attribute any contacts of the eight subsidiary corporations to the [parent] . . . on the

22

grounds either that [the parent] exerted greater than normal control over its subsidiaries, or that the subsidiaries acted as agents, or that the subsidiaries were merely empty shells." 964 F. Supp. at 1261. The court based this decision on the fact that the parent and the subsidiaries had the same principal place of business and phone number and shared the same executives, directors, and shareholders. Id.

Accordingly, this Court finds that Clark Enterprises and Clark Onterie, through their ownership interest in the shell companies have an ownership interest in real property located in Illinois, and therefore, this Court has jurisdiction over Clark Enterprises and Clark Onterie under 735 ILCS 5/2-209(a)(3). Additionally, as explained in more detail above, this Court holds that it would not be unreasonable to exercise personal jurisdiction over Clark Enterprises and Clark Onterie.

In sum, this Court DENIES the Motion to Dismiss Under Rule 12(b)(2) For Lack of Personal Jurisdiction as to BFGI, Clark Enterprises and Clark Onterie and GRANTS the motion with respect to BFTGI.

## II.     Motion to Dismiss for Failure to State a Claim

In addition to the 12(b)(2) motion, Defendants have moved to dismiss, pursuant to Rule 12(b)(6), for failure to state a claim.[7]

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must assume the truth of all facts alleged in the pleadings, construing allegations liberally and viewing them in the

---

[7]     Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, Clark Enterprises, and Clark Onterie have moved to dismiss all claims, while LMA has only moved to dismiss Counts II, IV, V, and VI.

23

light most favorable to the non-moving party. See, e.g., McMath v. City of Gary, 976 F.2d 1026, 1031 (7th Cir. 1992); Gillman v. Burlington N. R.R. Co., 878 F.2d 1020, 1022 (7th Cir. 1989). Dismissal is properly granted only if it is clear that no set of facts which the plaintiff could prove consistent with the pleadings would entitle the plaintiff to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Kunik v. Racine County, Wis., 946 F.2d 1574, 1579 (7th Cir. 1991) (citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

The court will accept all well-pled factual allegations in the complaint as true. Miree v. DeKalb County, 433 U.S. 25, 27 n.2 (1977). In addition, the court will construe the complaint liberally and will view the allegations in the light most favorable to the non-moving party. Craigs, Inc. v. General Electric Capital Corp., 12 F.3d 686, 688 (7th Cir. 1993). However, the court is neither bound by the plaintiff's legal characterization of the facts, nor required to ignore facts set forth in the complaint that undermine the plaintiff's claims. Scott v. O'Grady, 975 F.2d 366, 368 (7th Cir. 1992).

Before discussing the merits of Defendants' Rule 12(b)(6) motion, however, this Court must first determine which state's substantive law applies to Plaintiffs' claims. Federal courts sitting in diversity jurisdiction apply the choice-of-law rules of the state in which the court sits. Midwest Grain Prods. of Ill., Inc. v. Productization , Inc., 228 F.3d 784, 787 (7th Cir. 2000).[8]

---

[8]     Plaintiffs unfortunately overlooked this basic principle in their choice of law argument. The cases they cited in their brief apply the choice-of-law rules of Massachusetts, McAdams v. Mass. Mut. Life Ins. Co., 2002 WL 1067449 (D. Mass. May 15, 2002), and California, Nibeel v. McDonald's Corp., 1998 WL 547286 (N.D. Ill. Aug. 1998) (the court applied California choice-of-law rules because the case was transferred from California). Consequently, the cases cited by plaintiff are inapposite.

Accordingly, this Court will apply Illinois choice-of- law rules to determine which state's law applies to the claims at issue.

The parties here agree that the law of Massachusetts applies to Plaintiffs' breach of contract claim (Count III) because the Franklin Partnership Agreement ("the Agreement") contains a choice-of-law provision which states that: "[t]his Agreement shall be construed and enforced in accordance with the law of the State [Massachusetts]." The litigants, however, disagree on how broadly or narrowly this Court should apply the Agreement's choice-of-law provision. Plaintiffs contend that the provision applies to all of their claims, while Defendants assert that it only applies to the breach of contract claim. Applying Illinois choice-of-law rules, this Court finds that the answer lies between both parties' positions.

In determining the breadth of a contractual choice-of-law provision under Illinois law, courts apply a two part analysis. Medline Indus. Inc. v. Maersk Med. Ltd., – F. Supp. 2d –, 2002 WL 31557181, at *3-4 (N.D. Ill. Nov. 14, 2002); Precision Screen Mach. Inc. v. Elexon, Inc., 1996 WL 495564, *2-3 (N.D. Ill. Aug. 28, 1996).

First, the court should examine the language of the contract's choice-of-law clause to determine if the parties "intended [it] to govern all claims between them." Medline Indus. Inc., 2002 WL 31557181, at *3-4. In making this determination, it must be clear that the parties intended to apply the choice-of-law provision "to all disputes related" to the contract. Union Oil Co. of Ca. v. John Brown E&C, 1994 WL 535108, at *3 (N.D. Ill. Sept. 30, 1994). See also Kuehn v. Children's Hosp. of Los Angeles, 119 F.3d 1296, 1302 (7th Cir. 1997)(a contractual choice-of-law provision "will not be construed to govern tort as well as contract disputes unless it is clear that is what the parties intended"). In Union Oil Co., 1994 WL 53108, at *1, 3, the

25

court held that a choice-of-law provision, which stated that "[t]his contract shall be construed, interpreted, and enforced in accordance with the law and jurisprudence of the State of California," did not demonstrate that the parties clearly intended to apply California law to claims not related to the contract. Similarly, in Precision Screen Mach. Inc., 1996 WL 495564, *2-3, the court held that a choice-of-law provision, which stated that the contract "shall be governed and construed in accordance with, the internal laws of the State of New Jersey," did not indicate a clear intent to apply New Jersey law to all disputes.

Here, the choice-of-law provision states that "[t]his Agreement shall be construed and enforced in accordance with the law of the State [Massachusetts]." Based on this language, the Court finds that the parties did not clearly intend the Agreement's choice-of-law provision to broadly apply to all disputes arising out of the Agreement.

The parties' intent, however, is not determinative. "[T]ort claims that are dependent upon the contract are subject to [the] contract's choice-of-law clause[,] regardless of the breadth of the clause." Medline Indus. Inc., 2002 WL 31557181, at *3. See also Precision Screen Mach. Inc, 1996 WL 495564, *2-3 (noting that under Illinois law, courts have applied contractual choice-of-law provisions to tort claims, where that tort "was dependent on the contract"). In determining whether a tort claim is dependent upon the contract, courts examine whether:

(1) "the [claim] alleges a wrong based upon interpretation and construction of the contract," Medline Indus. Inc., 2002 WL 31557181, at *3; (2) the "tort claims [are] closely related to the parties' contractual relationship," Miyano Mach. USA, Inc. v. Zonar, 1994 WL 233649, at *2 (N.D. Ill. May 23, 1994); and (3) the tort claim "could exist without" the contractual agreement which contains the choice-of-law provision, Precision Screen Mach. Inc, 1996 WL 495564, *2-3.

26

After examining each of Plaintiffs' claims, this Court finds that the claims for breach of fiduciary duty, breach of good faith and fair dealing, and intentional interference with contractual relations are dependent on the Agreement. The breach of fiduciary duty claim (Count I) alleges that based on the Agreement, Defendants, as general partners, owed Plaintiffs, as limited partners, a fiduciary duty of trust, loyalty, due care, candor, and fidelity. (See Compl. at ¶¶ 13-16.) Likewise, the claim for breach of good faith and fair dealing (Count IV) alleges that this duty originates from the Agreement. (See id. at ¶ 91.) Thus, without the existence of the Agreement, Defendants would not have owed Plaintiffs a fiduciary duty or a duty of good faith and fair dealing, and thus, these claims could not have existed without the contract and are based upon and closely related to the contract.

Similarly, Plaintiffs' claim for intentional interference with contractual relations (Count V) alleges that the Agreement is a valid and enforceable contract and that Defendants' actions interfered with Plaintiffs' legal rights under the Agreement. Therefore, the Court finds that this claim likewise could not have existed without the Agreement and is based upon and closely related to the Agreement.

In contrast to these counts, the Court finds that Plaintiffs' claim under the Illinois Consumer Fraud Act (Count II), for negligent misrepresentation (Count VII), and for fraud (Count VI) are independent of the Agreement, and therefore, not governed by the Agreement's choice-of-law provision. All three of these claims are premised, not upon the Agreement, but on alleged misstatements and omissions which Defendants made to Plaintiffs in the February 23 Memorandum and in the course of the buy-out of the limited partners' interests in the Franklin Partnership. Thus, these claims, while related to the Agreement, are not based upon the

27

interpretation of the Agreement and could exist without the Agreement. See Chicago Printing Co. v. Heidelberg USA, Inc., 2001 WL 1134862, *3 (N.D. Ill. Sept. 25, 2001) (holding that a contractual choice-of-law provision did not apply to a claim for negligent misrepresentation because the claim was separate from the contract); Mellon Bank, N.A. v. Miglin, 1995 WL 230492, at *7 (N.D. Ill. Jan. 10, 1995) (holding that a claim for negligent misrepresentation "arose independently from the contract").

Accordingly, this Court will apply Massachusetts's law, per the Agreement's choice-of-law provision, to Counts I, IV, and V. As for Counts II, VI, and VII, this Court must apply Illinois choice of law rules in determining which jurisdiction's substantive law applies to these counts. See Medline Indus. Inc., 2002 WL 31557181, at *4 (holding that courts should follow the state's choice-of-law rules where the contractual choice-of-law provision does not apply).

In determining which substantive law to apply to tort claims, Illinois law requires courts to use the "most significant relationship test." Id. Under this test, courts examine four factors: (1) the place of injury; (2) the place of the tortious conduct; (3) the domicile of the parties; and (4) the place where the relationship between the parties is centered. Id. Generally, the "place of injury" controls unless another state has a more significant interest. Id.

Applying these factors to the present case, this Court finds that Illinois has the most significant relationship to Counts II, VI, and VII. The place of injury is where Plaintiffs live – Illinois and Minnesota. As explained above, the relationship of the parties is centered around the Onterie Center which is located in Illinois. Likewise, the alleged tortious conduct took place in Illinois. Consequently, this Court finds that Illinois law governs Counts II, VI, and VII.

In sum, this Court will apply Massachusetts's law to Counts I, III, IV, and V and Illinois law to Counts II, VI, and VII. The Court will now discuss each of these claims in turn.

### A.    Breach of Fiduciary Duty (Count I)

Defendants contend that except for the two general partners – Milk Street and LMA – Plaintiffs have failed to state a claim for breach of fiduciary duty because the other Defendants, who were not general partners, did not owe Plaintiffs a fiduciary duty. In response, Plaintiffs argue that the non-general partner Defendants owed them a fiduciary duty because they owned and/or controlled the general partners and assisted in and profited from the general partners' alleged wrong doing.

Under Massachusetts' law, a general partner owes the limited partners a "fiduciary duty of the 'utmost good faith and loyalty'" and must consider the limited partners' "welfare and refrain from acting for purely private gain." Wartski v. Bedford, 926 F.2d 11, 13-14 (1st Cir. 1991) (quoting Cardullo v. Landa, 105 N.E.2d 843 (Mass. 1952)).

While Massachusetts has not addressed the issue, several other states have held that limited partners may bring a breach of fiduciary claim against the parents and affiliates of the general partner where the limited partners allege that the parents and affiliates controlled the affairs of the general partner and caused or participated in the breach of the fiduciary duty. See Wallace v. Wood, 752 A.2d 1175, 1181-82 (Del. Ch. 1999); Chase Pratt, LLC v. Aetna Life Ins. Co., 1999 WL 229214, at *6-7 (Conn. Super. Ct. Mar. 19, 1999).

Here, after examining the Complaints, this Court finds that Plaintiffs have sufficiently alleged that Defendants controlled the general partners (Milk Street and LMA) and participated in or caused the alleged wrongful conduct. For example, Plaintiffs allege that "[t]he general and

29

limited partners of Milk Street were all employees and owners of Boston Financial" (Compl. at ¶ 23), and that the Boston Financial entities (BFTGI, BFGI, and BFGLP) controlled the Franklin Partnership. (Id. at ¶ 6.) Plaintiffs also allege that through its control of Milk Street, the Boston Financial entities participated in the scheme to improperly get the limited partners to sell their interests in the Franklin Partnership. (See id. at ¶¶ 37-49, 48-51, and 66-72.) Plaintiffs further allege that Lend Lease owns and controls the Boston Financial entities, and that through its control of the Boston Financial entities, Lend Lease controlled Milk Street. (Id. ¶ 6.) Consequently, this Court finds that Plaintiffs have sufficiently alleged that BFTGI, BFGI, BFGLP, and Lend Lease controlled Milk Street and participated in or caused the alleged wrongful conduct.

Likewise, Plaintiffs allege that the other general partner of the Franklin Partnership – LMA - is a "wholly owned subsidiary" of Lake Michigan and that Clark Onterie (a "wholly owned subsidiary of Clark Enterprises") is the majority owner of Lake Michigan. (Id. ¶¶ 9-12.) While Plaintiffs do not specifically allege that Lake Michigan, Clark Onterie, and Clark Enterprises caused or participated in the alleged wrongful conduct, Plaintiffs allege that all Defendants "aided, abetted, [or] assisted" the general partners in breaching their fiduciary duties. Consequently, construing the complaint liberally and viewing the allegations in the light most favorable to Plaintiffs, Craigs, Inc., 12 F.3d at 688, this Court finds that Plaintiffs have sufficiently alleged that Lake Michigan, Clark Onterie, and Clark Enterprises controlled LMA and participated in or caused the alleged wrongful conduct.

Accordingly, the Court DENIES the motion to dismiss as to Count I.

## B.    Illinois Consumer Fraud Act (Count II)

Defendants contend that Plaintiffs lack standing to bring a claim under the Illinois Consumer Fraud And Deceptive Business Practices Act ("ICFA") because they fail to allege that: (1) they were "consumers" under the ICFA; and (2) the transaction at issue implicated consumer protection concerns.

The ICFA defines "consumer" as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS § 505/1(e). "Merchandise" is defined to include "any objects, wares, goods, commodities, intangibles, real estate . . ., or services." 815 ILCS § 505/1(b). Illinois courts "liberally construe" the ICFA and "give a broad definition to consumer." Randazzo v. Harris Bank Palatine, 104 F. Supp. 2d 949, 954 (N.D. Ill. 2000). See also Bell Enter. Venture Santanna Natural Gas Corp., 2001 WL 1609417, at *4 (N.D. Ill. Dec. 12, 2001) ("[t]he ICFA broadly defines a consumer").

Although no Illinois court appears to have addressed whether the purchasers of an interest in a limited partnership, whose only asset is real property, are consumers within the ICFA, courts have held that purchasers of real estate, see Randels v. Best Real Estate, Inc. 612 N.E.2d 984 (Ill. App. Ct. 1993), securities, Wislow v. Wong, 713 F. Supp. 1103, 1107 (N.D. Ill. 1989), and franchise licenses, Bixby's Food Sys., Inc. v. McKay, 985 F. Supp. 802, 807 (N.D. Ill. 1997), are "consumers" within the scope of the ICFA.

In Bixby's Food Sys., Inc., 985 F. Supp. at 807, a franchisee brought an ICFA claim against its franchisor. The defendant moved to dismiss on the grounds that the plaintiff did not have standing because the franchisee was not a "consumer" under the ICFA. Id. Denying this

motion, the court held that Illinois courts have "broadly defined" merchandise and that franchise rights could constitute "intangibles" under a broad construction of merchandise. Id.

Here, Plaintiffs purchased an interest in the Franklin Partnership, whose sole asset was the Onterie Center. Thus, Plaintiffs' purchase is akin to the purchase of both securities and real estate (such as a Real Estate Investment Trust). Given the broad construction of the ICFA, this Court finds that Plaintiffs have alleged sufficient facts at this time to fall within the ICFA's broad definition of consumer.

Defendants' second contention – that the transaction at issue does not implicate consumer protection concerns – is likewise unpersuasive. When the plaintiff itself is a consumer, the plaintiff does not need to show that the transaction implicates consumer protection concerns; this factor only comes into play when the purchaser is a business. See Indus. Specialty Chem., Inc. v. Cummins Engine Co., Inc., 902 F. Supp. 805, 812 (N.D. Ill. 1995); Reshal Assoc., Inc. v. Long Grove Trading Co., 754 F. Supp. 1226, 1237 (N.D. Ill. 1990). A plaintiff/consumer may bring a claim under the ICFA based upon a single, isolated injury, and [] need not [allege] wide-spread effect on consumers generally." Indus. Specialty Chem., Inc., 902 F. Supp. at 812. Here, Plaintiffs have alleged injury both to themselves and to the numerous other limited partners.

Accordingly, this Court finds that Plaintiffs have standing to bring an ICFA claim, and the Court therefore DENIES the motion to dismiss as to Count II.

## C.    Breach of Contract (Count III)

Defendants have also moved to dismiss the breach of contract claim, as to all of the Defendants who were not general partners, on the grounds that only the general partners -- Milk Street and LMA – were parties/signatories to the Franklin Partnership Agreement. Defendants

are correct in noting that it is well settled black letter law that only parties to a contract are bound by that contract. 17B CSJ Contracts § 630 (2002); In re Tri-Star Tech. Co., Inc., 260 B.R. 319, 327 (Bankr. D. Mass. 2001).

In an attempt to get around this rule, Plaintiffs contend that – as they did in their breach of fiduciary argument – the non-general partner Defendants are liable for breach of contract because they owned and/or controlled the general partners and assisted in and profited from the general partners' breach of contract. Plaintiffs, however, have failed to cite, and this Court has not found, any law which supports this unique argument. One of the cases discussed above, Wallace, 752 A.2d 1175 at 1181-82, which held that affiliates and parents could be liable for breach of fiduciary duty for controlling and causing the wrongful conduct of the general partner, also held that the parents and affiliates were not liable for breach of contract for a contract to which they were not parties – only the signatory/general partner was liable for the breach. Id. at 1180.

Accordingly, this Court GRANTS the motion to dismiss Count III as to the non-general partner Defendants – Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, Clark Enterprises, and Clark Onterie.

**D.    Breach of Good Faith and Fair Dealing (Count IV)**

Defendants contend that Count IV should be dismissed because Illinois does not recognize an independent claim for breach of good faith and fair dealing. As discussed above, however, Massachusetts' law applies to this claim, and Massachusetts does recognize an independent claim for breach of the covenant of good faith and fair dealing which is implied in every contract. Anthony's Pier Four, Inc. v. HBC Assoc., 583 N.E.2d 806, 820 (Mass. 1991).

Under this theory, "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." Id. To state a claim for breach of good faith and fair dealing, the plaintiff must allege that: "(1) a contract existed between the parties; and (2) the defendant acted in bad faith, causing the plaintiff to be deprived of a benefit promised under the contract." Id.

Here, it is undisputed that a contract (the Franklin Partnership Agreement) existed between the general partners (Milk Street and LMA) and the Plaintiffs, who were two of the limited partners. As discussed above, however, Plaintiffs have not alleged that a contract existed between them and the non-general partner Defendants. Plaintiffs also allege that Defendants "have acted to deprive the Limited Partners of the fruits of the Partnership Agreement." (Compl. at ¶ 90.) Consequently, this Court finds that Plaintiffs have properly stated a claim for breach of good faith and fair dealing against the general partners -- Milk Street and LMA - but not against the remaining Defendants. The Court thus DENIES the motion to dismiss Count IV as to LMA but GRANTS the motion as to Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, Clark Enterprises, and Clark Onterie.

### E. Intentional Interference with Contractual Relations (Count V)

Defendants contend that Plaintiffs have failed to sufficiently allege a claim for intentional interference with contractual relations. To state a claim for intentional interference with contractual relations under Massachusetts law, a plaintiff must allege that: "(1) [the plaintiff] had a contract with a third party, (2) the defendant knowingly induced the third party to break the contract, and (3) the plaintiff was harmed by the defendant's actions." United Truck Leasing

34

Corp. v. Geltman, 551 N.E.2d 20, 21 (Mass. 1990).[9] Additionally, the plaintiff must allege that "what the defendant intentionally did was wrongful or improper in its means or ends." Id.

Here, Defendants contend that Plaintiffs have failed to allege that any Defendant used any improper means to induce a third party to breach a contract or that any Defendant was aware of a contract. As explained above, however, Plaintiffs have alleged that Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, Clark Enterprises, and Clark Onterie controlled the general partners of the Franklin Partnership and participated in or caused the alleged wrongful conduct. Likewise, in paragraphs 96-98 of the Complaint, Plaintiffs allege that: (1) there was a valid contract between Plaintiffs and a third party (the Franklin Partnership Agreement between the limited partners and the general partners); (2) Defendants "improperly and intentionally" interfered with these contractual relations which caused the general partners to breach the Agreement with the limited partners; and (3) as a result of this interference, Plaintiffs (and the other limited partners) incurred damages.

Consequently, this Court finds that Plaintiffs have sufficiently alleged a claim for intentional interference with contractual relations, and thus, the motion to dismiss is DENIED as to Count V.

---

[9]     Defendants cite only to Illinois law on intentional interference with contractual relations, which is essentially identical to Massachusetts law. See Strosberg v. Brauvin Realty Serv., Inc., 691 N.E.2d 834, 845 (Ill. App. Ct. 1998).

## F.    Fraud (Count VI)

Defendants have also moved to dismiss Counts VI (fraud claim) and II (ICFA claim) on the grounds that these claims fail to specifically plead fraud as required by Federal Rule of Civil Procedure 9(b).

Rule 9(b) provides that "the circumstances constituting fraud . . . shall be stated with particularity."[10] Fed. R. Civ. P. 9(b). Circumstances constituting fraud "include the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." General Elec. Capital v. Lease Resolution, 128 F.3d 1074, 1078 (7th Cir.1997). In other words, Rule 9(b) requires a plaintiff to plead "the who, what, when, where and how" of the fraud. DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990). The purpose underlying Rule 9(b)'s particularity requirement is to: (1) protect the defendant's reputation; (2) minimize "strike suits and fishing expeditions"; and (3) provide notice of the claim. Vicom, Inc. v. Harbridge Merchant Services, Inc., 20 F.3d 771, 777 (7th Cir.1994). However, although a plaintiff must plead the circumstances of the alleged fraud with particularity, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).

Here, a careful review of the Complaint reveals that Plaintiffs have adequately pled facts setting forth "the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." General Elec. Capital, 128 F.3d at 1078. For example, as

---

[10]    Claims under the ICFA must also comply with Rule 9(b)'s requirements. See Swift v. First USA Bank, 1999 WL 965449, at *5 (N.D. Ill. 1999).

36

discussed above, the February Memorandum was mailed to Plaintiffs either directly by Defendants or indirectly by Defendants through affiliated companies on February 23, 1999. The February Memorandum proposed a buy-out of the Franklin Partnership whereby LMA would replace Milk Street as the Franklin Partnership's general partner, acquire the limited partners' interests, and ultimately acquire the Onterie Center. Plaintiffs allege that the February Memorandum was "false and misleading" in that it: (1) misrepresented Onterie's value in order to induce the Limited Partners to grant their consents; (2) failed to disclose pervasive conflicts of interest which were part of the buy-out scheme; and (3) left out pertinent and fundamental information which Defendants were required to disclose. The details of each of these misrepresentations are fully alleged in the Complaint, so as to comply with Rule 9(b)'s particularity requirement. As a result of the misrepresentations in the February Memorandum, Plaintiffs allege that the Defendants improperly acquired the limited partners interests "for far less than their true value" and caused the limited partners to unnecessarily incur "huge tax liabilities."

Accordingly, this Court finds that Plaintiffs have alleged sufficient facts to meet Rule 9(b)'s particularity requirement, and thus, the motion to dismiss Count VI is DENIED.

### G.  Negligent Misrepresentation (Count VII)

Lastly, Defendants contend that Plaintiffs have failed to adequately plead a claim for negligent misrepresentation under Illinois law. To state a claim for negligent misrepresentation, the plaintiff must allege that the defendant: "(1) made a negligent misrepresentation of material fact; (2) is in the business of providing investment information; and (3) made the misrepresentation while guiding [the plaintiff] in [its] business relations with third parties."

Lennon v. Christoph, 1997 WL 57150, at *26 (N.D. Ill. Feb. 7, 1997). The "pivotal[]" inquiry in determining whether the defendant is "in the business of supplying investment information," is whether the defendant is "in the business of supplying information for the guidance of other[s] in their transactions." Canel v. Lincoln Nat'l Bank, 1998 WL 1760544, at *9 (N.D. Ill. Aug. 6, 1998).

Courts applying the above elements have held that "the tort of negligent misrepresentation is a narrow one." Lennon, 1997 WL 57150, at *26. For example, in Canel, 1998 WL 1760544, at *9, in recommending that the district court grant summary judgment as to a claim for negligent misrepresentation, the magistrate judge found that the plaintiff failed to show that the defendant was in "the business of supplying information" because the defendant only supplied information to the plaintiff for "a specific isolated transaction." Id. Similarly, in Lennon, 1997 WL 57150, at *26, in granting summary judgment for a claim of negligent misrepresentation, the court held that the plaintiff did not demonstrate that the defendant was "in the business of supplying information" because the defendant provided the investment information for the purpose of guiding the plaintiffs in making their own investment decisions, not for the plaintiffs to use "in their business relations with third parties," as required by Illinois law.

Here, after carefully reviewing the Complaint, this Court finds that Plaintiffs have failed to allege that Defendants are in the business of providing investment information. Plaintiffs allege that Defendants only provided investment information for this specific transaction to guide Plaintiffs in making their own investment decisions, not for use in their business relations with third parties. Consequently, this Court finds that Plaintiffs have failed to sufficiently plead a

claim for negligent misrepresentation, and therefore, GRANTS the motion to dismiss as to Count VII.

In Sum, the Defendants' Rule 12(b)(6) motions are GRANTED as to Counts III and IV with respect to Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, Clark Enterprises, and Clark Onterie and Count VII with respect to all moving Defendants, while the motion is DENIED as to Counts I, II, V, and VI with respect to all Defendants and Count IV with respect to LMA.

With respect to the counts which have been dismissed, the Court grants Plaintiffs leave to file an amended complaint within 21 days consistent with their Rule 11 obligations.

## CONCLUSION

For the reasons discussed above, this Court:

- DENIES the Motion to Dismiss Under Rule 12(b)(2) For Lack of Personal Jurisdiction [37-1, 36-1, and 9-1] as to BFGI, Clar Enterprises and Clark Onterie and GRANTS the motion with respect to BFTGI; and

- GRANTS the Motion to Dismiss Under Rule 12(b)(6) For Failure to State a Claim [37-1, 36-1, 9-1, 7-1] as to Counts III and IV with respect to Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, Clark Enterprises, and Clark Onterie and Count VII with respect to all moving Defendants, and DENIES the motion as to Counts I, II, V, and VI with respect to all Defendants and Count IV with respect to LMA.

It is so ordered.

**ENTER:**

**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

**DATE:** 1/17/03

40